IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION NO. 1:20-cr-00188-LMM-RDC-5 |
| RICHARD CLARK, | |
| Defendant. | |

**FINAL REPORT AND RECOMMENDATION**

Defendant Richard Clark has been indicted along with multiple co-defendants on two drug-related charges.[1] (Doc. 52). He now moves to suppress physical evidence seized during a warrantless vehicle search conducted on March 20, 2020 following a traffic stop. (Docs. 127, 175). The undersigned held an evidentiary hearing on the matter on October 28, 2021. *See* (Docs. 165, 169). Having fully considered the evidence, the applicable law, and the parties' written and oral arguments, the undersigned **RECOMMENDS** that Mr. Clark's motion to suppress be **DENIED**.

---

[1] Specifically, Mr. Clark has been indicated for conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1); and possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count 2). (Doc. 52).

## I.   BACKGROUND

The summary below is taken largely from the following: (1) a transcript of the October 28, 2021 evidentiary hearing,[2] at which U.S. Drug Enforcement Agency ("DEA") Special Agent James Brown ("Agent Brown") and Georgia State Patrol Trooper Brian Harman ("Trooper Harman") testified; and (2) a transcript of the March 20, 2020 traffic stop.[3]

In March 2020, the DEA obtained information from a confidential source indicating that the residence at 472 Martin St. SE, Unit 3, in Atlanta, Georgia was being used as a methamphetamine stash house. (HT. 6–7).

On March 20, 2020, Agent Brown and several other DEA agents surveilled both 472 Martin St. and a secondary location at which the DEA believed a drug transaction could take place. (HT. 6–11). During the operation, agents maintained regular communication with each other over the radio and through WhatsApp, a text messaging application. (HT. 8–9). Several state troopers, including Trooper Anthony Munoz ("Trooper Munoz"), were also included in the WhatsApp group chat. (HT. 9).

At around 11:00 a.m. that day, DEA agents observed a female, later identified

---

[2] (Doc. 169) (hereinafter "HT.").

[3] The Government submitted an audio/video recording of the traffic stop as an exhibit at the evidentiary hearing. (Doc. 166). Subsequently, the Government submitted a transcript of approximately the first ten minutes of the recording (hereinafter "VT.").

2

as co-defendant Jessie Bea Jones, exit the residence at 472 Martin St. and meet the male driver of a vehicle parked in the driveway, who was later identified as co-defendant Marco Antonio Garcia. (HT. 9–10). The pair removed a cardboard box and duffle bag from the vehicle and entered the house. (HT. 10). Minutes later, Mr. Garcia emerged alone with a duffle bag, which he placed in his vehicle before driving away. (*Id.*). Agent Brown testified that, based on his training and experience, the conduct of Mr. Garcia and Ms. Jones was indicative of a drug transaction. (*Id.*). Mr. Garcia's vehicle was tailed and, at approximately 11:20 a.m., it was stopped by state troopers at the DEA agents' request. (HT. 11, 16). Inside, they found a duffle bag with approximately $118,000 in cash. (HT. 11).

About an hour later, at approximately 12:20 p.m., DEA agents observed a red Jeep arrive at 472 Martin St. (HT. 14). At that time, the DEA had no information associating the Jeep or its occupants with the house or any criminal activity. (HT. 18). A second female, later identified as co-defendant Maria Andrea Browning, then exited the house holding a yellow shopping bag. (HT. 14). Ms. Browning walked over to the passenger's side of the Jeep and exchanged the bag for a large envelope, which she placed under her shirt before re-entering the residence. (*Id.*). The contents of the bag and envelope were not visible to Agent Brown or other surveilling agents. (HT. 19). After the exchange, the Jeep drove away and agents lost sight of it in traffic. (HT. 14).

Trooper Munoz, who had remained in contact with DEA agents throughout the operation, then phoned Trooper Harman and requested that he find and stop the red Jeep. (HT. 9, 14, 23–24, 34–35). Trooper Munoz told Trooper Harman that he was assisting the DEA with a surveillance operation, during which DEA agents observed the Jeep stop at a suspected stash house and exchange a large envelope for a yellow shopping bag with one of the house's occupants. (HT. 24, 34–36). Relying on the Jeep's license plate number and information obtained from an automated license plate reader located on Interstate 85 ("I-85"), Trooper Munoz explained the Jeep was likely headed south on the highway. (HT. 24).

At approximately 1:30 p.m., Trooper Harman stopped the Jeep on I-85. (HT. 15, 24). The entire traffic stop was recorded by Trooper Harman's dash cam, but only the first ten minutes or so of the stop are relevant for present purposes. (HT. 25, 37). Trooper Harman informed the driver, later identified as co-defendant Robert Williams, that he stopped the vehicle because portions of its license plate were not visible. (VT. 2; HT. 27–28). Mr. Clark was riding as a passenger in the Jeep, which belonged to his wife. (VT. 1; HT. 26). At the hearing, Trooper Harman testified that, although he made the traffic stop at Trooper Munoz's request, he didn't inform the Jeep's occupants of the suspected drug transaction for safety reasons—in his words, "you never know how [a] person is going to react." (HT. 28). Shortly after the traffic stop was initiated, another officer arrived to assist. (*Id.*).

Mr. Clark and Mr. Williams exited the Jeep at Trooper Harman's request, after which they both consented to a vehicle search. (VT. 2, 7–8; HT. 29–30). Trooper Harman then found a yellow shopping bag in plain view on the passenger's side floorboard. (VT. 9–10; HT. 31). He was able to see a crystallized substance that turned out to be methamphetamine located inside the bag. (VT. 9–10; HT. 32).

Mr. Clark was arrested and the bag was seized. Following his indictment, he filed the instant motion to suppress, which is now ripe for review.

## II.  THE PARTIES' CONTENTIONS

Mr. Clark wishes to suppress the physical evidence obtained after the March 20, 2020 traffic stop. (Docs. 127, 175, 186). His argument proceeds in three parts. First, Mr. Clark contends that law enforcement lacked reasonable suspicion to believe he was involved in any criminal activity to begin with. According to him, while DEA agents were surveilling 472 Martin St. they only observed his vehicle stop at the house and exchange an envelope for a yellow shopping bag. They did not, however, observe the contents of the exchanged items, nor did the agents have any reason beforehand to associate him or his vehicle with suspected criminal activity at the residence. Second, even if DEA agents had reasonable suspicion after his vehicle departed 472 Martin St., he argues that such suspicion cannot be imputed to Trooper Harman, who made the ensuing traffic stop, because the surveillance team did not maintain the requisite level of contact with Trooper Harman needed to invoke the

5

so-called "collective knowledge" doctrine. Finally, Mr. Clark insists that whatever reasonable suspicion may have initially existed after he left 472 Martin St. dissipated by the time Trooper Harman made the traffic stop more than one hour, and several miles, later.[4] For all these reasons, Mr. Clark contends the physical evidence seized from the vehicle should be excluded.

In response, the Government maintains the collective knowledge of the agents and officers involved in the surveillance operation established reasonable suspicion that Mr. Clark was involved in a crime;[5] moreover, such suspicion may be fairly imputed to Trooper Harman based on communications between he and Trooper Munoz before the traffic stop was initiated. (Doc. 183). In the Government's view, reasonable suspicion was supported by evidence showing the following: (i) the residence under surveillance had been identified as a stash house by a confidential informant; (ii) another suspected drug transaction was witnessed at the house just hours before Mr. Clark's arrival; and (iii) after Mr. Clark's vehicle stopped at the house, an occupant traded a large envelope with someone from the house in return for a shopping bag. Thereafter, the Government continues, Trooper Munoz shared

---

[4] The final component of Mr. Clark's challenge was first raised in his reply brief. *See* (Doc. 186). Ordinarily, arguments raised for the first time in reply are treated as waived. *See United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011). Nevertheless, the undersigned has elected to address the timeliness of the traffic stop in this report.

[5] Without conceding the contrary, the Government does not argue the traffic stop was justified in this case by the violation of any traffic laws, whether related to license plate obstruction or otherwise. (Doc. 183 at 5 n.2).

6

sufficient details of the surveillance operation and the vehicle's activity at the stash house to impute reasonable suspicion to Trooper Harman before the traffic stop was made. Therefore, the Government insists the traffic stop was reasonable.[6]

### III.  DISCUSSION

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). To justify a traffic stop, officers "need only 'reasonable suspicion'—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (quotation and citation omitted). Reasonable suspicion "is determined from the totality of the circumstances, and from the collective knowledge of all the officers involved in the stop," *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (citation omitted), provided the officers "maintained at least a minimal level of communication during their investigation," *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). "The question is not whether a specific

---

[6] As a fall back, the Government argues the evidence seized in this case should not be excluded *even if* officers lacked reasonable suspicion to stop the Jeep because Mr. Clark's consent to search the vehicle was an intervening circumstance that severed the connection between the stop and the ensuing search and seizure. (Doc. 183 at 9–12). Because the undersigned finds that officers had reasonable suspicion to initiate the traffic stop at issue, it is unnecessary at present to address the Government's alternative argument.

7

arresting officer actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify" the stop. *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (citation and alterations omitted). After careful consideration, the undersigned concludes that officers did not violate the Fourth Amendment in this case.

As an initial matter, DEA agents surveilling 472 Martin St. had reasonable suspicion to believe the occupants of the red Jeep that stopped at the address shortly after noon on March 20, 2020—including Mr. Clark—had participated in an illegal drug transaction. Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien*, 574 U.S. at 60. The standard was met here. For starters, agents had been tipped off that the residence operated as a methamphetamine stash house, and shortly before the Jeep arrived that day another suspected drug transaction involving co-defendant Mr. Garcia had taken place in the driveway. (HT. 6–11). That prior transaction was corroborated when officers found more than $118,000 in cash in Mr. Garcia's vehicle soon after leaving the property.[7] (HT. 11, 16). These just-described indicia of drug activity were present *before* the Jeep arrived at 472 Martin St., serving as the

---

[7] The undersigned previously found that officers had probable cause to stop Mr. Garcia's vehicle after departing from 472 Martin St. *See United States v. Garcia*, No. 1:20-cr-00188-LMM-RDC-1, 2021 WL 2652963, at *5 (N.D. Ga. June 10, 2021), *adopted by* 2021 WL 2651355 (N.D. Ga. June 28, 2021).

8

backdrop against which agents appraised the Jeep's activity. (HT. 15–16). While mere presence in an area of expected criminal activity alone cannot establish reasonable suspicion, there was more to this story.

Most importantly, as Agent Brown testified, the particular actions of the Jeep's occupants themselves—*i.e.*, exchanging a large envelope for a shopping bag outside the house—was "very consistent with a drug transaction." (HT. 16). From these aggregated facts, investigating officers could reasonably conclude the Jeep's occupants had committed a crime. *See, e.g., Nunez*, 455 F.3d at 1226 (finding reasonable suspicion to stop the defendant's vehicle after he was seen leaving a suspected drug trafficking house with a black trash bag capable of concealing drugs); *United States v. Powell*, 222 F.3d 913, 917–18 (11th Cir. 2000) (finding reasonable suspicion to stop the defendant's vehicle after she walked into the garage of a known drug dealer's house with a backpack but emerged a few minutes later without it). It does not matter that officers couldn't see the contents of the envelope or the bag during the exchange, as argued by Mr. Clark, because reasonable suspicion deals with probabilities, not "hard certainties." *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (quotation and citation omitted); *see also United States v. Bruce*, 977 F.3d 1112, 1120 (11th Cir. 2020) ("The truth is that no one needed to see criminal activity: reasonable suspicion may be formed by observing exclusively legal activity." (quotation and citation omitted)). To meet the requisite standard,

9

officers may rely on their own training or experience, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), along with "commonsense judgments and inferences about human behavior," *Nunez*, 455 F.3d at 1226 (quotation and citation omitted), all of which established reasonable suspicion in this case.

Even if DEA agents had reasonable suspicion to believe the occupants of the red Jeep had committed a crime, however, the next question raised by Mr. Clark is whether that suspicion may be fairly imputed to Trooper Harman, who made the traffic stop. The short answer is yes. The collective knowledge (and corresponding reasonable suspicion) of investigating officers as a group may be imputed to a single officer who conducts a stop so long as that officer "maintained at least a minimal level of communication during [the] investigation." *Willis*, 759 F.2d at 1494. The evidence shows as much here. Agent Brown testified that DEA agents surveilling 472 Martin St. were in "constant" contact with each other by radio and text through WhatsApp. (HT. 8). Several state troopers, including Trooper Munoz, were included in the WhatsApp group chat, through which participants communicated information and real-time updates regarding the operation. (HT. 8–9).

When agents lost the Jeep in traffic after departing from 472 Martin St., Trooper Munoz—again, an active participant in the operation—phoned Trooper Harman and requested that he stop the Jeep on the highway. (HT. 9, 14, 23–24, 34–36). In doing so, he shared with Trooper Harman key details within the collective

10

knowledge of the investigating team which led them to believe the Jeep's occupants had participated in an illegal drug transaction—specifically, that agents surveilling a suspected stash house had recently observed the Jeep's occupants exchange an envelope for a shopping bag outside the house. (HT. 23–24, 34–36). As other judges in this District have held, nothing more is required.[8]

Finally, Mr. Clark contends that any reasonable suspicion that may have existed in his case dissipated by the time Trooper Harman made the traffic stop, but the undersigned disagrees.[9] As already recounted, the evidence shows that Mr.

---

[8] *See, e.g., United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with state patrolmen prior to the operation, communicated with them during the operation, and directed them to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *United States v. Khan*, No. 1:17-CR-0040-SCJ, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018) (finding sufficient minimal communications where the DEA contacted a state trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Morris*, No. 1:19-CR-389-LMM-CCB, 2020 WL 7497333, at *1 (N.D. Ga. Nov. 10, 2020) (finding sufficient communication where the DEA made arrangements to have sheriff's deputies in the area to assist with a traffic stop, the DEA "generally informed" a sergeant about the drug investigation and that it involved a large quantity of methamphetamine, and the sergeant then relayed the information to a deputy who conducted the stop), *adopted by* 2020 WL 7495610 (N.D. Ga. Dec. 21, 2020).

[9] Mr. Clark actually invokes the staleness doctrine to challenge the viability of reasonable suspicion at the time of the traffic stop. (Doc. 186). While related to the notion of dissipation, the staleness doctrine—as the cases cited by Mr. Clark themselves show—is generally applied within the context of warrant applications. *See, e.g., United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000) ("We have developed a staleness doctrine in the context of probable cause which requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."). In any event, for the same reasons described above, the undersigned concludes the information on which investigating officers acted was not stale when the traffic stop was initiated. *Cf. United States v. Walthour*, 202 F. App'x 367, 369–70 (11th Cir. 2006) (information supporting search warrant was not stale where the most recent suspected drug transaction occurred 72 hours earlier and nine days before search was conducted).

11

Clark's Jeep drove away from a suspected stash house at around 12:20 p.m. after making a suspicious exchange. Although agents lost track of the vehicle for a period thereafter, they had two important pieces of information—first, the Jeep's license plate number; and second, travel data from an automated license plate reader mounted on I-85. Using this information, Trooper Harman located and then stopped the Jeep as it was travelling on the highway at approximately 1:30 p.m. The identity of the Jeep is undisputed—*i.e.*, it was the same Jeep that left the suspected stash house. And there is simply no indication in the record that the reasonable suspicion of illegal drug activity initially established when the Jeep was observed at 472 Martin St. had dissipated by the time it was stopped just over an hour later. There is no evidence, for example, that the Jeep stopped on its own in the interim or changed occupants. Mr. Clark suggests the time and distance that elapsed before the traffic stop alone eroded any legitimate basis to effect a seizure, but he identifies no good reason or persuasive precedent in support.[10] *Cf. United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985) ("When criminal activity is protracted and continuous, it

---

[10] In his argument, Mr. Clark cites to cases from the Georgia Court of Appeals, the D.C. Circuit, the Second Circuit, and the Seventh Circuit. *See* (Doc. 186 at 3). While they all involve Fourth Amendment issues, the cited decisions are not binding on this Court nor does the undersigned find them relevant or persuasive on the question of dissipation. In those cases, unlike the instant one, the Government failed to show either any facts supporting a traffic stop at all, *see Duke v. State*, 571 S.E.2d 414, 416 (Ga. Ct. App. 2002), or any evidence that the defendant conducted a suspicious exchange justifying a stop, *see United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000); *United States v. Swindle*, 407 F.3d 562, 569 (2nd Cir. 2005); *United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997).

is more likely that the passage of time will not dissipate probable cause."). To be sure, information supporting a seizure may grow stale with the passage of time, but that was not the case here. Absent any evidence to the contrary, it was reasonable for officers to believe the occupants of the red Jeep travelling on the highway at 1:30 p.m. were the same ones who made a suspicious trade at a suspected stash house little more than an hour earlier.

### IV.   CONCLUSION

For all of the reasons presented above, the undersigned **RECOMMENDS** that Defendant's motion to suppress, (Docs. 127, 175), be **DENIED**. Because there are no other pretrial motions related to Defendant Richard Clark pending before the undersigned, his case is **CERTIFIED READY FOR TRIAL**.

IT IS SO **RECOMMENDED** on this 1st day of March 2022.

_____
REGINA D. CANNON
United States Magistrate Judge